# EXHIBIT A

1  CORREIA & PUTH, PLLC
2  Linda M. Correia (pro hac vice forthcoming)
   Andrew M. Adelman (SBN 298718)
3  1400 16th St. NW, Suite 450
   Washington, DC 20036
4  Tel. (202) 602-6500
   Fax (202) 602-6501
5  Email:  LCorreia@correiaputh.com
          AAdelman@correiaputh.com
6
   BRYAN SCHWARTZ LAW
7  Bryan Schwartz (SBN 209903)
   Erica Posey (SBN 356109)
8  180 Grand Ave., Ste. 1380
   Oakland, California 94612
9  Tel. (510) 444-9300
   Fax (510) 444-9301
10 Email:  Bryan@BryanSchwartzLaw.com
          Erica@BryanSchwartzLaw.com
11
   Attorneys for Plaintiff
12 Elizabeth Vedernikova Khanna

ELECTRONICALLY
F I L E D
Superior Court of California,
County of San Francisco

12/15/2025
Clerk of the Court
BY: GERMAN PEREZ
Deputy Clerk

13              **SUPERIOR COURT OF THE STATE OF CALIFORNIA** CGC-25-631646

14                       **FOR THE COUNTY OF SAN FRANCISCO**

15

16 | ELIZABETH VEDERNIKOVA KHANNA, | Case No.: _____

17 |                               | **COMPLAINT FOR DAMAGES AND**
                                     **INJUNCTIVE RELIEF**
18 |              Plaintiff,       |
        vs.                         | 1. **Violations of Cal. Lab. Code §§ 1101, 1102**
19 |                               | 2. **Wrongful Termination in Violation of**
                                       **Public Policy**
20 | MAPLEBEAR, INC. D/B/A/ INSTACART, |
                                     | **DEMAND FOR JURY TRIAL**
21 |              Defendant.       |

22

23

24

25

26

27

28

COMPLAINT

Plaintiff Elizabeth Vedernikova Khanna alleges her Complaint against Defendant Maplebear, Inc. d/b/a Instacart, as follows:

## I.      NATURE OF THE ACTION

1.      Elizabeth (Lisa) Khanna was a successful employee of Defendant Maplebear, Inc. d/b/a Instacart (hereinafter "Instacart"), enjoyed her job, and developed strong, trusting relationships with her colleagues. Therefore, in April 2025 she was excited to tell her supervisor and colleagues that she intended to run in the Democratic primary for the Congressional seat where she lived, and was reassured when the company told her she had its support to run in the months leading up to her June 11, 2025 campaign launch. Those favorable winds shifted on June 6, when Defendant reviewed a copy of her website outlining the political positions she intended to take in her campaign, specifically support for abortion rights and gun control. Suddenly, Defendant determined that the potential risk of Republican backlash to the company outweighed Ms. Khanna's right to run for public office. In the following hours, Defendant prohibited Ms. Khanna from running for Congress while keeping her job, ostensibly enforcing company rules and policies, and less than two weeks later it terminated her because of her stated policy positions.

2.      California Labor Code § 1101 prohibits an employer from enforcing any rule or policy that prevents an employee from becoming a candidate for public office or that controls or tends to control or direct the political activities of an employee. California Labor Code § 1102 also prohibits an employer from coercing an employee, by threatening termination of their employment, to adopt or follow or refrain from adopting or following any particular course or line of political action or political activity.

2
COMPLAINT

3.    Instacart's conduct violates Sections 1101 and 1102 of the California Labor Code. Instacart wrongfully terminated Ms. Khanna in violation of the fundamental public policy of the State of California.

## II.    PARTIES

4.    Plaintiff is an adult female resident of the Commonwealth of Virginia. At all times relevant hereto, Ms. Khanna was an employee of Instacart within the meaning of the California Labor Code.

5.    Defendant Maplebear, Inc. d/b/a Instacart ("Instacart"), is a Delaware corporation with its principal place of business in San Francisco, California. At all times relevant hereto, Instacart was Ms. Khanna's employer within the meaning of the California Labor Code.

## III.    VENUE

6.    Venue is proper in San Francisco County, California under California Code of Civil Procedure § 395.5 as the principal place of business and headquarters of Defendant.

7.    Venue is proper in San Francisco County, California under California Code of Civil Procedure § 395.5 because the Defendant's unlawful actions giving rise to liability were committed in San Francisco County, California.

8.    The amount in controversy in this matter exceeds the sum of $35,000.

## IV.    JURISDICTION

9.    This court has personal jurisdiction over Defendant as a corporation with its principal place of business and headquarters in San Francisco County, California.

10.    Jurisdiction is also proper under California Code of Civil Procedure § 410.10.

3

## V.    FACTUAL ALLEGATIONS

11.    Instacart's Chief Corporate Affairs Officer ("CCAO") Dani Dudeck interviewed and selected Ms. Khanna to serve as her Chief of Staff.

12.    Before joining Instacart, Ms. Khanna served as Chief of Staff to the Chairman of the *New York Times* and Chief of Staff to the Chief Executive Officer of the Democratic National Committee.

13.    Instacart hired Ms. Khanna in December 2022, to begin in February 2023.

***A California company based in San Francisco, Instacart hires Ms. Khanna, and she excels in her role.***

14.    At the time it hired her, Instacart required Ms. Khanna to sign an offer letter, which defined her compensation and employee benefits, and included as a condition of employment a Proprietary Information and Inventions Agreement ("PIIA").

15.    Instacart's offer letter and its PIIA formed the complete and exclusive agreement (the "Agreement") between the company and Ms. Khanna regarding her employment.

16.    The Agreement delineated the nature of Ms. Khanna's employment, her rights and limitations around use of intellectual property, post-employment obligations (notification of new employment and non-solicitation clauses), and provisions for relief.

17.    Instacart chose the laws of the State of California as the governing law for the PIIA, and it required Ms. Khanna to expressly consent to the personal jurisdiction and venue of the state and federal courts located in the federal Northern District of California for any lawsuit concerning rights or obligations under the PIIA.

18.    Ms. Khanna signed the Agreement on December 21, 2022.

19.    As Chief of Staff to the CCAO, Ms. Khanna reported directly to Dudeck. Ms. Khanna's primary job duties were to provide strategic advice to the CCAO in executing her own

4

duties (*e.g.,* external meetings, public engagement, cross-company strategy), as well as assistance managing the 40+ person team that supported Dudeck.

20.    Instacart maintains its headquarters in San Francisco, where many of its employees work, including its human resources, legal, and communications teams.

21.    Dudeck and most others in the Instacart C-suite leadership – including its then-Chief Executive Officer – worked in California and maintained physical offices at Instacart's San Francisco headquarters.

22.    Throughout the relevant time, Dudeck maintained a physical office in and primarily worked from Instacart's San Francisco's headquarters.

23.    Most of the 40+ member team that Dudeck oversaw worked out of Instacart's San Francisco headquarters, or otherwise worked in California, including Instacart's Vice President of Policy & Government Affairs and Vice President of Communications (both of whom reported to Dudeck).

24.    Throughout her employment, Ms. Khanna traveled to San Francisco on a very frequent (almost-monthly) basis to work in-person with Dudeck and others in the company's headquarters. Ms. Khanna's work trips to San Francisco varied in length anywhere from 24 hours to over a week for a single visit.

25.    For example, in September 2023, Ms. Khanna travelled to Instacart's SF-headquarters and worked in California for over a week to assist the company for its debut to be publicly traded on the Nasdaq Global Select Market.

26.    Ms. Khanna's Instacart-issued laptop connected to a central network at Instacart's SF-office, and she maintained availability during California business hours.

27.    Ms. Khanna's day-to-day interactions relevant to her employment and the facts at issue in this Complaint were with Instacart personnel and decision-makers located in California.

28.    Dudeck praised Ms. Khanna's performance in glowing terms each of the times she prepared a formal written review of Ms. Khanna's work.

29.    Ms. Khanna relied on her previous personal and professional contacts she developed through her career to advance the interests of Instacart, and Dudeck lauded her for these efforts in the assessments of Ms. Khanna's performance.

30.    As a reward for Ms. Khanna's excellent performance, Instacart granted her annual raises and grants of Restricted Stock Units ("RSUs"), which vested quarterly.

31.    As further reward for Ms. Khanna's excellent performance, Instacart granted her refresh grants of additional RSUs in or around October of each year.

***Ms. Khanna tells Instacart that she is going to run for Congress, and her colleagues say they are supportive.***

32.    On April 29, 2025, Ms. Khanna notified Dudeck that she wanted to run in the Democratic primary for Virginia's first Congressional district and hoped to launch her campaign on June 11.

33.    Virginia's first Congressional district (VA-01) encompasses the Richmond, Virginia suburbs and surrounding area and has been represented by Republican incumbent Congressman Rob Wittman since 2007.

34.    Dudeck responded with enthusiasm to Ms. Khanna's stated aspiration to run for the Congressional seat. Dudeck said she did not foresee any problems with Ms. Khanna launching a primary campaign, and she told Ms. Khanna that she did not have any concern about Ms. Khanna's bandwidth to continue performing her job duties with Instacart while also running a campaign for public office.

6

35.    On April 30, 2025, Ms. Khanna shared her campaign plan with Instacart Vice President of Policy & Government Affairs Casey Aden-Wansbury. Aden-Wansbury responded that Ms. Khanna would be a great Congresswoman and that she wanted to see more women elected to Congress.

36.    At all relevant times, Aden-Wansburry lived in San Francisco, California, worked from Instacart's San Francisco's headquarters on a weekly basis, and performed her job duties for Instacart in California.

37.    On the advice of Dudeck, Ms. Khanna then emailed Senior Counsel Sean Creadick, whom she informed of her planned primary campaign and Dudeck's assessment that Ms. Khanna could continue working while running for office, and suggested a meeting with him and Aden-Wansbury. Creadick responded with enthusiasm and agreed that a meeting was in order given that her candidacy would be the most "visible" of the outside activities that the company had reviewed. Creadick invited other members of the Legal team to join, including Associate General Counsels Nathan Cao (corporate) and Shaudee Navid (employment).

38.    At all relevant times, Senior Counsel Creadick and Associate General Counsels Cao and Naveed worked for Instacart from California.

39.    On May 5, 2025, Ms. Khanna met with Instacart's Legal and Policy teams (including Aden-Wansbury, Creadick, Cao, and Naveed) to discuss her campaign. During the meeting, the Legal and Policy team members asked Ms. Khanna only a handful of basic questions (regarding matters such as the date, time, and location of her planned primary campaign launch), and the group discussed approaching Ms. Khanna's campaign through regular check-ins at six-month intervals. Creadick ended the meeting by stating that he would run the matter through outside counsel and get back to Ms. Khanna.

COMPLAINT

40.     After May 5, neither Instacart's Legal nor Policy team met with Ms. Khanna again to discuss her campaign.

41.     On May 14, Creadick sent Ms. Khanna a document containing several questions and asking for her to fill in "general responses," as well as a "general timeline and outline of what [campaign] activities [she] will be engaging in from now until the end of the year." Creadick wrote that Instacart would use the information Ms. Khanna provided to the company to decide whether to approve her campaign as an outside activity under the relevant company rules and policies.

42.     Ms. Khanna provided the information requested by Creadick and awaited further instruction.

43.     Instacart's "PGA Outside Activity Review Process" outlines the outside activity approval process for its Policy and Governmental Affairs employees, including Ms. Khanna. It requires employees to first seek approval from the company prior to accepting a position outside their employment with Instacart. Instacart's stated purpose of engaging the process is "to avoid situations where the outside activity may conflict or appear to conflict with [the employee's] work at Instacart."

44.     Instacart's PGA Outside Activity Review Process is a company rule or policy.

45.     Instacart's Conflicts of Interest Policy prohibits employees from engaging in outside activities where an employee's "personal interest interferes, or has the appearance of interfering, with Instacart's interests." The Conflicts of Interest Policy provides the following example as one that could create a conflict of interest:

> Participating in an elected or appointed position in a political or government organization whose activities or goals conflict with Instacart's goals or views[.] For example, holding public office, such as a state legislator, and voting on matters that directly impact Instacart's business operations in the state. Or accepting an appointment to a state agency that oversees consumer protection issues and deciding matters that could impact Instacart.

8

COMPLAINT

46.     Throughout May, Dudeck continued to express her support of Ms. Khanna's campaign, advocating for Ms. Khanna during a lunch with the President of the House Majority PAC (a potential funder of Ms. Khanna's race), expressing an interest in hosting a fundraiser for Ms. Khanna in the fall, and encouraging Ms. Khanna to attend certain events for political advantage.

47.     On May 23, 2025, Dudeck telephoned Ms. Khanna and for the first time expressed some anxiety about Ms. Khanna's run, telling Ms. Khanna that the Policy team was worried that a high-profile race would negatively affect political relationships that the company had worked to build. Ms. Khanna told Dudeck that the process thus far had not been transparent. Ms. Khanna said that no one had spoken with her about her campaign since May 5, let alone brought any concerns to her or asked her any questions other than the very general questions during the May 5 meeting. Dudeck ended the call without any clear follow up.

48.     To reassure Dudeck, Ms. Khanna drafted a document with a timeline and detailed context of how she expected her campaign would take shape from its launch in June 2025 through November 2026, which she transmitted to Dudeck on May 27.

49.     In that document, Ms. Khanna defined her campaign in three six-month phases, "Exploratory" (June through December 2025), "Primary" (January through June 2026), and "General Election" (June through November 2026), with the second and third phases being contingent on her success in each preceding phase. Ms. Khanna noted that she would only continue her primary campaign past the Exploratory phase if she raised over $1 million by December 2025. She wrote that the Exploratory phase would focus on fundraising, community events across the Congressional district, and efforts to set herself apart from Democratic opponents. Ms. Khanna stated that her campaign platform would be based on kitchen-table issues that affected her constituents, such as affordability. She wrote that she generally did not plan to position herself as a candidate in opposition

9

COMPLAINT

to President Trump or the Republican party, and that she would not spend the first almost year of her campaign defining herself against the Republican incumbent.

50.    To show that it would not be unprecedented for a corporate employee in tech to continue working while running for public office, Ms. Khanna listed examples of various corporate employees – some prominent tech leaders – who ran for political office, including Congress, while continuing to serve in their corporate roles during their campaigns.

51.    During the Exploratory phase, Ms. Khanna intended to campaign only after work hours, on weekends, and on any weekday for which she used paid time off.

52.    Upon receiving Ms. Khanna's campaign timeline and context document, Dudeck responded that she intended to share it with Aden-Wansbury and Vice President of Communications, Kelly Pakula.

53.    VP Pakula primarily worked for Instacart from its San Francisco's headquarters or from her home in California.

54.    No one followed up with Ms. Khanna about the timeline and context document.

55.    Around this time, Ms. Khanna proactively worked to remove all online content connecting her to Instacart, including deleting her LinkedIn profile and removing Instacart from her search engine optimization, to minimize any chance that someone searching for her on the internet would be able to associate her with the company.

***Instacart appears poised to approve Ms. Khanna's campaign under its rules and policies.***

56.    On Friday, May 30, 2025, Dudeck told Ms. Khanna by telephone that she had spoken with Instacart's Legal, Policy, and HR teams, and that the company agreed to "approach [her] run in phases" with periodic check-ins, as was previously discussed. Dudeck told Ms. Khanna that she was

COMPLAINT

clear to move forward with her planned campaign launch and continue to serve as Dudeck's Chief of Staff.

57.    When Ms. Khanna said that she had not yet heard any response from the Legal or Policy teams since their May 5 meeting, Dudeck suggested she reach out.

58.    On Monday, June 2, 2025, Ms. Khanna emailed Creadick and Aden-Wansbury to request a meeting to "walk [her] through the guardrails [they'd] like [her] to maintain." That meeting was scheduled for June 9, just two days before the planned primary campaign launch.

59.    On June 2, Ms. Khanna traveled to San Francisco to manage a retreat at Instacart's San Francisco headquarters that she had planned for Dudeck's 40+ member team, including Aden-Wansbury and Pakula. Ms. Khanna was in California for work-related activities for two days.

60.    On June 5, 2025, Aden-Wansbury emailed Ms. Khanna two documents to read in advance of the June 9 call.

61.    Both documents suggested that Instacart was on track to greenlight Ms. Khanna's campaign.

62.    The first document, an "Outside Activity Review" assessment, identified considerations from Employment / Human Resources (associated with Naveed), Political Law (associated with Creadick), and Policy / Government Affairs / Communications for the conflicts committee and other stakeholders to consider to determine whether to approve the outside activity. It outlined several "guardrails" governing Ms. Khanna's campaign activities while at work. The "guardrails" included: "Use only your personal devices for your candidate/campaigning activities," and "Lisa may not solicit contributions from workplace colleagues or subordinates."

63.    Under the "Policy / Government Affairs / Communications" section, the document included recommended steps "to create as much of a real and perceived firewall as possible between

11

COMPLAINT

the company and the campaign." These steps included regular check-ins, documentation that Ms. Khanna did not use company time for her campaign, and strategies to distance Ms. Khanna from Instacart's policy-related positions or decision-making.

64.    The "Outside Activity Review" stated that Ms. Khanna's campaign would occur "[i]n her time outside of Instacart work" and that she and her manager, Dudeck, were "confident that [Ms. Khanna] will be able to manage this outside of her work activity."

65.    The "Outside Activity Review" acknowledged that Ms. Khanna's "actions in connection with the race will occasionally be public."

66.    Aden-Wansbury wrote the second document and circulated it as a "pre-read . . . as [they] plan for specific next steps."

67.    Instacart speculated that, after the exploratory phase, Ms. Khanna's campaign presented risk to the company because she might take policy stances that differed from those of Instacart and because her campaign would involve criticizing Republicans in Congress and the Trump Administration, which could be attributed to Instacart.

68.    Also on June 5, 2025, Dudeck telephoned Ms. Khanna and instructed her to collaborate with Pakula to develop a communications plan around her June 11 launch.

69.    That evening, Ms. Khanna conferred with Pakula and Director of Policy Communications J.D. Harrison on Slack and shared with them the two documents circulated by Aden-Wansbury on June 5, as well as talking points from Dudeck. Those talking points included that Dudeck was "thrilled to support" Ms. Khanna and that her campaign was "a unique extracurricular activity" that was "approved" by Instacart.

70.    Pakula shared with Ms. Khanna that Dudeck was "talking to FSD" (or "Fidji Simo's Directs," an abbreviation referring to outgoing-CEO Fidji Simo and the C-suite executives who

12

COMPLAINT

reported to her) "about what this will look like and sound like" and that "they're asking to see messaging."

71.     Upon information and belief, Dudeck had not informed Simo or incoming-CEO Chris Rogers about Ms. Khanna's planned campaign before June 5, 2025.

72.     Upon information and belief, Dudeck informed Simo and Rogers about Ms. Khanna's planned campaign on June 5, 2025.

73.     After Donald Trump was elected to a second term in November 2024, Simo had taken several actions to strengthen Instacart's and her relationship with the Trump Administration. Simo directed Dudeck to send a gift to Ivanka Trump celebrating her father's election victory, made Instacart donate $100,000 to President Trump's inaugural fund, and instructed the Policy team to work for months to secure meetings with high-level associates close to the Administration, including Health and Human Services Secretary Robert F. Kennedy Jr. and Ambassador to France Charles Kushner.

74.     In the morning on Friday, June 6, 2025, Ms. Khanna met with Pakula and Harrison to discuss Instacart's communication strategy around her campaign. When Ms. Khanna described the political issues in her campaign as "more Democratic related topics like gun control," Pakula suggested that Aden-Wansbury "would have a problem with even a stance on gun control." Ms. Khanna told Pakula and Harrison that "nothing relevant to Instacart's policies, like gig economy issues, are a part of my platform or on my website."

75.     During the meeting, Ms. Khanna told Pakula and Harrison that she had deactivated her LinkedIn account and removed it from her search optimization to minimize any risk that someone would be able to associate her campaign with Instacart.

13

COMPLAINT

76.    In response to certain strategic questions about inquiries that Instacart might receive, Ms. Khanna offered to share with them a copy of her campaign website content.

77.    Shortly after the meeting, Ms. Khanna sent Pakula and Harrison a copy of her campaign website, which described her top priority campaign issues, including "reproductive freedom," lowering the costs of prescription drugs and health insurance, and "common-sense gun safety measures."

78.    Ms. Khanna's website copy described no positions on policies which directly affect Instacart's business.

79.    Ms. Khanna's website copy did not mention the gig economy or policy stances on employee classification (*e.g.,* employee vs. independent contractor).

80.    Ms. Khanna's website copy did not mention President Trump or the Trump Administration, did not contain the word "Republican," and made only one mention of the incumbent who currently represented the district, referencing a recent vote of his on a bill that would cut Medicaid funding.

81.    Instacart's Communications team drafted a document titled "Messaging Guidance & Internal Comms," for the company to use for internal, stakeholder, external, and media communications – including an internal email and Slack message, an external press statement, and Q&A, and it appended to that document Ms. Khanna's campaign website copy.

82.    The Messaging Guidance & Internal Comms document was shared on June 6 with Aden-Wansbury, Creadick, Cao, HR Business Partner Lindsay Munro, and others, each of whom made revisions and inserted comments either that day or in the days following.

83.    HR Business partner Lindsay Munro primarily worked for Instacart from San Francisco, California.

14

84.     The Messaging Guidance & Internal Comms document started with a heading "Reference Materials" that included links to the two documents circulated on June 5 by Aden-Wansbury.

85.     Instacart's Communications team shared those two documents with everyone who had access to the Messaging Guidance & Internal Comms document for them to review.

86.     The Messaging Guidance & Internal Comms document stated that Instacart had approved Ms. Khanna's campaign as an outside activity, that she would remain employed by Instacart until her campaign becomes "high profile and high volume," and that the early stage of her candidacy posed no conflict of interest for Instacart. The document stated that Instacart had established guardrails to manage and mitigate conflicts, including removing Ms. Khanna from any policy- or government affairs-related responsibilities. The document stated that during this phase Instacart would monitor and adapt to ensure a clear separation between Ms. Khanna's views and the company's positions. The document noted that Instacart "from the start" had considered the "risk [of] backlash from Republicans" associated with Ms. Khanna running as a Democratic Congressional candidate. The document stated that Instacart's intent was "to preserve [its] political neutrality and policy relationships," which it was "committed to protecting."

87.     Aden-Wansbury, Creadick, Cao, and Munro edited the document, and they did not make any changes to the document's substantive conclusion that Instacart had "approved" Ms. Khanna's primary campaign as an outside activity.

***Instacart uses its rules and policies to deny Ms. Khanna's efforts to run for office while an employee, making her choose between her job and her campaign. When she doesn't, it fires her.***

88.     The evening of June 6, 2025, Dudeck telephoned Ms. Khanna with "bad news." According to Dudeck, because Instacart had reviewed Ms. Khanna's campaign website describing her policy priorities and "could now see [the topics] that [Ms. Khanna would] be taking a stance on, like

15

abortion," the company was no longer comfortable with her campaigning while an employee. Dudeck made it clear that Ms. Khanna's stated policy positions on her campaign website were the reason that the company had revised its decision. Dudeck told Ms. Khanna that they would discuss "next steps" the following week.

89.     During the call, the only reason Dudeck stated for the company's change in position was Ms. Khanna's policy positions.

90.     The Instacart executives and employees who informed the decision and/or decided not to approve Ms. Khanna's request to run for Congress as an outside activity pursuant to Instacart's rules and policies worked in California and made the decision while working in California.

91.     On the evening of June 8, 2025, Aden-Wansbury cancelled the long-awaited meeting between Ms. Khanna and the Policy and Legal teams that had been scheduled for the next day.

92.     On June 10, 2025, the day before Ms. Khanna's planned campaign launch, Dudeck and Ms. Khanna had a series of telephone calls in which they discussed how Instacart might proceed with Ms. Khanna's employment during her campaign. Dudeck told Ms. Khanna that Instacart would allow Ms. Khanna to take either two weeks of paid leave or a month of unpaid leave, after either of which Instacart conditioned Ms. Khanna's continued employment with Instacart on her ending her campaign. Dudeck told Ms. Khanna that the company needed a response three hours later, by 6:00 p.m. that day, and she emailed those two options to Ms. Khanna for her consideration.

93.     When Ms. Khanna asked Dudeck during their calls whether she could keep her job during her campaign, Dudeck responded that Ms. Khanna "having to take positions the company doesn't take" made it "a showstopper" from a conflict-of-interest perspective, and "there's no way the leadership team can get past that." Dudeck stressed that Instacart's receipt of "the campaign material from [Ms. Khanna's] website copy was . . . very hard for them to overcome."

16

COMPLAINT

94.    In a telephone call that evening, Ms. Khanna responded that she could not accept either option, and she later explained that she felt like she was "being punished" for her political activity.

95.    Dudeck never telephoned Ms. Khanna again after June 10.

96.    On June 11, 2025, Ms. Khanna launched her campaign. She was excited about the campaign, received a positive response, and raised substantial financial contributions in the first 24 hours. Nothing from her campaign materials mentioned Instacart.

97.    Instacart did not receive a single press inquiry about Ms. Khanna's campaign on June 11 or in the two days that followed.

98.    Also on June 11, Ms. Khanna publicly filed a Statement of Candidacy disclosing her candidacy and party affiliation with the Federal Election Commission, a filing she was required by federal election law to make.

99.    On June 12, Ms. Khanna spoke twice by phone with Munro about the company's response to her campaign launch.

100.    During the first call, Munro agreed with Ms. Khanna that Instacart's decision was not driven by any concern about whether Ms. Khanna had the capacity to perform her job duties while campaigning. Instead, Munro said, the issue Instacart had was with Ms. Khanna's "public stances" and the "potential reactions [to those stances] from the media."

101.    Ms. Khanna responded that she felt "like Instacart is worried about retaliation from the Trump Administration because [she would be] running for Congress as a Democrat." She told Munro that she "was being forced to lose [her] livelihood because of [her] political views."

102.    Munro did not refute either point.

103.    Munro went on to explain that Ms. Khanna "running for Congress is considered an outside activity and falls within the existing outside activity process," which had resulted in a denial

17

of the request. Munro asked Ms. Khanna whether it was "an option [for her] to cancel her campaign" in order to keep her job. She said that "termination would be the next step assuming [Ms. Khanna was] going to run anyway."

104.    Ms. Khanna reminded Munro that she had launched her campaign the previous day. Munro responded that Instacart was ending Ms. Khanna's employment.

105.    On June 13, Instacart removed Ms. Khanna from her access to Instacart's databases and systems, including email and Slack.

106.    On June 16, 2025, Ms. Khanna telephoned Munro to let her know she had just learned she was pregnant, and that Instacart's decision was particularly difficult in light of this circumstance. Munro responded, "Congratulations, I guess?" Ms. Khanna authorized Munro to share the disclosure about her pregnancy with Dudeck and others with a need to know.

107.    On June 17, 2025, Munro telephoned Ms. Khanna and let her know that Instacart was terminating her employment, effective July 1, 2025, citing as its reason that Ms. Khanna "actively campaigning for a high profile office creates a conflict with [her] current role at Instacart." Munro told Ms. Khanna that she had "remain[ed] free to pursue [her] employment by not pursuing [her] Congressional campaign," but that Ms. Khanna had made "the choice to pursue [her] campaign."

108.    The Instacart executives and employees who informed the decision and/or decided to terminate Ms. Khanna's employment worked in California and made the decision while working in California.

109.    Because she no longer had access to the company's systems, email, or Slack, Ms. Khanna was unable to say goodbye to her colleagues.

COMPLAINT

110.    At no time before terminating Ms. Khanna's employment did Instacart ever implement or attempt to implement any of the guardrails identified in the Outside Activity Review that were intended to separate Ms. Khanna's campaign from her employment with the company.

111.    At no time before terminating Ms. Khanna's employment did Instacart ever ask Ms. Khanna about her policy positions on any issues related to Instacart's business, such as the gig economy or employee classification.

## FIRST CAUSE OF ACTION

### California Labor Code § 1101(a)
### Enforcing Policies to Prevent an Employee from Becoming a Candidate for Public Office

112.    Plaintiff incorporates by reference and re-asserts each of the facts set forth in Paragraphs 1-111 of this Complaint with the same force and vigor as if set out here in full.

113.    In relevant part, California Labor Code § 1101(a) prohibits an employer from making, adopting, or enforcing any rule or policy that prevents an employee from engaging or participating in politics or from becoming a candidate for public office.

114.    California Labor Code § 1101 serves to protect the fundamental right of employees to engage in political activity without interference or threat of retaliation from employers.

115.    Defendant is Plaintiff's employer, and Plaintiff is Defendant's employee.

116.    Defendant's Conflicts of Interest Policy and its PGA Outside Activity Review Process are company rules or policies.

117.    Defendant's Conflicts of Interest Policy and its PGA Outside Activity Review Process prohibit Defendant's employees from participating in politics or from becoming candidates for public office, in some circumstances.

COMPLAINT

118.    Defendant used its Conflicts of Interest Policy and its PGA Outside Activity Review Process to prevent Plaintiff from engaging or participating in politics and from becoming a candidate for public office.

119.    As a direct, legal, and proximate cause of Defendant's enforcement of its rules or policies, Defendant terminated Plaintiff's employment, and she suffered lost wages, employee benefits, and other compensation.

120.    As a direct, legal, and proximate result of Defendant's enforcement of its rules or policies, Defendant terminated Plaintiff's employment, and she suffered and continues to suffer humiliation, embarrassment, shame, pain, suffering, anguish, indignity, and loss of enjoyment of life.

121.    Defendant's actions were committed by managing agents and were willful, malicious, fraudulent and oppressive, and were committed with the wrongful intent to injure Plaintiff and in conscious disregard for Plaintiff's rights. Plaintiff therefore is entitled to recover punitive damages from Defendants in an amount according to proof.

122.    By reason of Defendant's conduct, Plaintiff has necessarily retained attorneys to prosecute the within action, a necessity and financial burden of private enforcement pursuant to the Labor Code. Plaintiff's prosecution of this action seeks to enforce an important right affecting the public interest, and such attorneys' fees should not, in the interest of justice, be paid out of the recovery, if any. Therefore, Plaintiff is entitled to attorneys' fees for prosecuting Labor Code violations and pursuant to California Code of Civil Procedure § 1021.5.

COMPLAINT

## SECOND CAUSE OF ACTION

### California Labor Code § 1101(b)
### Enforcing a Policy to Control an Employee's Political Activities

123.    Plaintiff incorporates by reference and re-asserts each of the facts set forth in Paragraphs 1-111 of this Complaint with the same force and vigor as if set out here in full.

124.    In relevant part, California Labor Code § 1101(b) prohibits an employer from making, adopting, or enforcing any rule or policy that controls or directs, or tends to control or direct, the political activities or affiliations of its employees.

125.    California Labor Code § 1101 serves to protect the fundamental right of employees to engage in political activity without interference or threat of retaliation from employers.

126.    Defendant is Plaintiff's employer, and Plaintiff is Defendant's employee.

127.    Defendant's Conflicts of Interest Policy and its PGA Outside Activity Review Process are company rules or policies.

128.    Defendant enforces its Conflicts of Interest Policy and its PGA Outside Activity Review Process to control or direct the political activities or affiliations of Defendant's employees by preventing them from participating in outside-of-work activities in which its employees advocate for policy positions that are not aligned with those of the company.

129.    Defendant used its Conflicts of Interest Policy and its PGA Outside Activity Review Process to control and direct Ms. Khanna's political activities and affiliation.

130.    As a direct, legal, and proximate cause of Defendant's enforcement of its rules or policies, Defendant terminated Plaintiff's employment, and she suffered lost wages, employee benefits, and other compensation.

COMPLAINT

131.    As a direct, legal, and proximate result of Defendant's enforcement of its rules or policies, Defendant terminated Plaintiff's employment, and she suffered and continues to suffer humiliation, embarrassment, shame, pain, suffering, anguish, indignity, and loss of enjoyment of life.

132.    Defendants' actions were committed by managing agents and were willful, malicious, fraudulent and oppressive, and were committed with the wrongful intent to injure Plaintiff and in conscious disregard for Plaintiff's rights. Plaintiff therefore is entitled to recover punitive damages from Defendants in an amount according to proof.

133.    By reason of Defendant's conduct, Plaintiff has necessarily retained attorneys to prosecute the within action, a necessity and financial burden of private enforcement pursuant to the Labor Code. Plaintiff's prosecution of this action seeks to enforce an important right affecting the public interest, and such attorneys' fees should not, in the interest of justice, be paid out of the recovery, if any. Therefore, Plaintiff is entitled to attorneys' fees for Labor Code violations and pursuant to California Code of Civil Procedure § 1021.5.

### THIRD CAUSE OF ACTION

**California Labor Code § 1102**
**Retaliation**

134.    Plaintiff incorporates by reference and re-asserts each of the facts set forth in Paragraphs 1-111 of this Complaint with the same force and vigor as if set out here in full.

135.    California Labor Code § 1102 prohibits an employer from attempting to coerce or influence its employees, through or by means of threat of discharge or loss of employment, to adopt or follow or refrain from adopting or following any particular course or line of political action or political activity.

136.    California Labor Code § 1102 serves to protect the fundamental right of employees to engage in political activity without interference or threat of retaliation from employers.

22

137.    Defendant was Plaintiff's employer, and Plaintiff was Defendant's employee.

138.    Defendant terminated Ms. Khanna's employment because she followed a particular course or line of political action or political activity by running for public office and maintaining policy positions that were not aligned with those of the company.

139.    Defendant was opposed to an employee running for public office when the employee had policy positions, like on abortion, that the company did not like or that were not aligned with those of the company.

140.    Defendant sought to coerce or influence Ms. Khanna to refrain from having certain policy positions in her campaign for public office or to refrain from running for public office with policy positions that were not aligned with those of the company by forcing her to either end her campaign or end her employment.

141.    Defendant terminated Ms. Khanna's employment when she refused to follow a particular line of political action or political activity that Defendant wanted or preferred.

142.    As a direct, legal, and proximate cause of Defendant's conduct, Defendant terminated Plaintiff's employment, and she suffered lost wages, employee benefits, and other compensation.

143.    As a direct, legal, and proximate result of Defendant's conduct, Defendant terminated Plaintiff's employment, and she suffered and continues to suffer humiliation, embarrassment, shame, pain, suffering, anguish, indignity, and loss of enjoyment of life.

144.    Defendant's actions were committed by managing agents and were willful, malicious, fraudulent and oppressive, and were committed with the wrongful intent to injure Plaintiff and in conscious disregard for Plaintiff's rights. Plaintiff therefore is entitled to recover punitive damages from Defendants in an amount according to proof.

COMPLAINT

145.    By reason of Defendant's conduct, Plaintiff has necessarily retained attorneys to prosecute the within action, a necessity and financial burden of private enforcement pursuant to the Labor Code. Plaintiff's prosecution of this action seeks to enforce an important right affecting the public interest, and such attorneys' fees should not, in the interest of justice, be paid out of the recovery, if any. Therefore, Plaintiff is entitled to attorneys' fees for Labor Code violations and pursuant to California Code of Civil Procedure § 1021.5.

**FOURTH CAUSE OF ACTION**

**Wrongful Termination in Violation of Public Policy**

146.    Plaintiff incorporates by reference and re-asserts each of the facts set forth in Paragraphs 1-111 of this Complaint with the same force and vigor as if set out here in full.

147.    California law provides for employees who are terminated for a reason that contravenes fundamental public policy to maintain an action in tort against the employer. *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 170.

148.    California Labor Code §§ 1101 and 1102 reflect California's substantial public interest in protecting a fundamental right of employees to engage in political activity without interference or threat of retaliation from employers.

149.    The statutory protections afforded to employee political speech and activity by California Labor Code §§ 1101 and 1102 inures to the public at large by promoting the types of public discussion and debate that are essential to maintaining a democratic system of government.

150.    Defendant was Plaintiff's employer, and Plaintiff was Defendant's employee.

151.    Defendant terminated Ms. Khanna's employment because she followed a particular course or line of political action and political activity by running for public office and maintaining policy positions that were not aligned with those of the company.

24

COMPLAINT

152.    Defendant was opposed to an employee running for public office when the employee had policy positions, like on abortion, that the company did not like or that were not aligned with those of the company.

153.    Defendant sought to coerce or influence Ms. Khanna to refrain from having certain policy positions in her campaign for public office or to refrain from running for public office with policy positions that were not aligned with those of the company by forcing her to either end her campaign or end her employment.

154.    Defendant terminated Ms. Khanna's employment when she refused to follow a particular line of political action or political activity that Defendant wanted or preferred.

155.    As a direct, legal, and proximate cause of Defendant's conduct, Defendant terminated Plaintiff's employment, and she suffered lost wages, employee benefits, and other compensation.

156.    As a direct, legal, and proximate result of Defendant's conduct, Defendant terminated Plaintiff's employment, and she suffered and continues to suffer humiliation, embarrassment, shame, pain, suffering, anguish, indignity, and loss of enjoyment of life.

157.    Defendant's actions were committed by managing agents and were willful, malicious, fraudulent and oppressive, and were committed with the wrongful intent to injure Plaintiff and in conscious disregard for Plaintiff's rights. Plaintiff therefore is entitled to recover punitive damages from Defendants in an amount according to proof.

158.    By reason of Defendant's conduct, Plaintiff has necessarily retained attorneys to prosecute the within action, a necessity and financial burden of private enforcement pursuant to the Labor Code. Plaintiff's prosecution of this action seeks to enforce an important right affecting the public interest, and such attorneys' fees should not, in the interest of justice, be paid out of the

recovery, if any. Therefore, Plaintiff is entitled to attorneys' fees pursuant to the Labor Code and California Code of Civil Procedure § 1021.5.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief against Defendants as follows:

1.     Enter judgment in favor of Plaintiff Elizabeth Vedernikova Khanna and against Defendant Maplebear, Inc. d/b/a Instacart on all counts contained herein;

2.     Declare Defendant's conduct in violation of the California Labor Code §§ 1101, 1102, and of the public policy of the State;

3.     Award Plaintiff back pay and order reinstatement, or front pay in lieu thereof;

4.     Compensatory damages, including emotional distress damages and economic damages, in a sum according to proof;

5.     Punitive damages in an amount according to proof;

6.     Interest on judgment, including pre-judgment interest, to the extent permitted by law;

7.     Recovery of all reasonable attorneys' fees, expert witness fees, litigation expenses, and costs incurred in the filing and prosecution of this action, pursuant to the Labor Code and California Code of Civil Procedure § 1021.5;

8.     An injunction ordering Defendant to provide mandatory and meaningful training to all executives, managers, and employees regarding the laws prohibiting interference with and retaliation against employees for their political actions and political activities; and

9.     Such other and further relief as the Court may deem proper.

**DEMAND FOR A JURY TRIAL**

Plaintiff hereby demand a jury trial on all issues.

26

COMPLAINT

DATED: December 15, 2025                Respectfully submitted,

                                        **CORREIA & PUTH, PLLC**

                                        By:    /s/ Andrew M. Adelman
                                        Linda M. Correia (Pro hac vice forthcoming)
                                        Andrew M. Adelman (SBN 298718)

                                        **BRYAN SCHWARTZ LAW**
                                        Bryan Schwartz (SBN 209903)
                                        Erica Posey (SBN 356109)

                                        Attorneys for Plaintiff
                                        Elizabeth Vedernikova Khanna

COMPLAINT

## __VERIFICATION__

I, Lisa Vedernikova Khanna, declare under penalty of perjury that I have read the foregoing Complaint and that it is true to the best of my personal knowledge.

12/14/25

_____
Date

_____
Plaintiff Elizabeth Vedernikova Khanna

28

COMPLAINT